# DECLARATION OF HSI SPECIAL AGENT CHRISTOPHER E. BRANT

I, Christopher E. Brant, having been duly sworn, do hereby depose and state:

1. I am a Special Agent (SA) of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been so employed for over 15 years. I am assigned to the HSI Raleigh, North Carolina field office (HSI-Raleigh) and my duties include, among other things, investigating violations of Titles 8, 18, 19, 21, 31, and 42 of the United States Code (U.S.C.). As part of these duties, I have led or participated in hundreds of investigations involving criminal and/or administrative violations of law. Prior to reporting for assignment at HSI-Raleigh, I attended training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where I received instruction in federal criminal statutes, search, seizure, and arrest authority, use of force, and many other facets of federal and general law enforcement. Prior to my employment with HSI, I worked five (5) years as an accountant and obtained undergraduate and master's degrees in business administration with concentrations in finance.

2. This declaration is based on my own knowledge and experience as well as information provided by other federal, state and/or local law enforcement agencies.

3. This declaration is made in support of forfeiture of $55,700 in U.S. currency seized from Othman Nagi (hereinafter referred to as "NAGI") on or about July 14, 2021, in the Eastern District of North Carolina. The U.S. currency is forfeitable pursuant to Title 18, U.S.C., Section 981(a)(1)(c), as it constitutes or is derived from proceeds traceable to specified unlawful activity, as defined in Title 18, U.S.C., Section 1957(c)(7), including the trafficking of contraband cigarettes in violation of Title 18, U.S.C., Section 2342.

GOVERNMENT EXHIBIT A

## SEIZURE OF $55,700 ON JULY 14, 2021

4. On or about July 14, 2021, at approximately 0440 hours, North Carolina State Highway Patrol (NCSHP) Trooper (Trp.) Parrott was performing stationary patrol on Interstate 85 in or near Vance/Granville County, North Carolina when he observed a Ford Expedition travelling southbound at a speed of 76-mph in a 70-mph zone. The Ford Expedition bore Florida license plate DZJI74. Trp. Parrott conducted a stop of the vehicle. Once the vehicle was stopped, Trp. Parrot exited his vehicle and approached the vehicle from the passenger side. While doing so, Trp. Parrott looked through the vehicle's rear windows and noted that the vehicle contained no luggage.

5. Trp. Parrott established contact with the driver through the front passenger window. Trp. Parrott recognized the driver as NAGI and stated, "You again?" (note that Trp. Parrott had conducted a traffic stop of NAGI a few days before for speeding). Trp. Parrott asked NAGI for his license and registration and asked NAGI to accompany him to his vehicle while he conducted record checks. NAGI became argumentative, stated that he was "being targeted for no reason", and refused to exit his vehicle. Trp. Parrot calmed NAGI by engaging him in conversation. During the conversation, NAGI stated, "I just came from Roanoke Rapids." Trp. Parrott asked NAGI how long he had been in Roanoke Rapids and NAGI responded, "I was there since yesterday." Trp. Parrott confirmed with NAGI that it was Roanoke Rapids, North Carolina. Parrott recalled from the earlier traffic stop that NAGI claimed he was employed as an Uber driver in New York. Trp. Parrott asked NAGI when he was going back to his business. NAGI responded, "I took a whole month vacation…" Trp. Parrott asked NAGI if he travelled to Roanoke Rapids the day before and NAGI responded, "yes." Trp. Parrott asked NAGI if he stayed the night in Roanoke Rapids, and NAGI responded, "I spent the night up there." Trp. When asked where he had stayed in Roanoke Rapids, NAGI stated "1321 Chase Avenue, that is the house I was in." Trp. Parrott noted that NAGI'S story made little sense, given

that during the previous traffic stop, NAGI has stated he was returning home to Raleigh, North Carolina, and because if NAGI was returning home to Raleigh, North Carolina from Roanoke Rapids, North Carolina, he would not be travelling on Interstate 85 through Vance/Granville County, North Carolina as it was well west of the expected route. Trp. Parrott allowed NAGI to remain in the vehicle while he conducted record checks.

6. Trp. Parrott conducted registration checks on the license plate on the Ford Expedition. The checks revealed that the license plate came back to a 2021 Nissan, not a Ford Expedition. The registration information revealed that the license plate had expired on or about June 30, 2021. Trp. Parrott confirmed the same through NCSHP Raleigh Communications. Trp. Parrott also noted that the expiration sticker on the license plate was "06-22", or June 2022, not the "06-21" that would have been expected if the tags expired on June 30, 2021.

7. Trp. Parrott conducted checks of the Ford Expedition's license plate in a license plate reader (LPR) system. The LPR system revealed that the license plate was scanned on or about July 7, 2021 (0600 hours), July 10, 2021 (0100 hours), and July 14, 2021 (0400 hours) in or near Granville County, North Carolina (note that Trp. Parrott's report mistakenly lists the dates as July 1, 2021, July 4, 2021, and July 6, 2021, however, dash cam video and audio revealed the dates were July 7, 2021, July 10, 2021, and July 14, 2021).

8. Trp. Parrott requested the assistance of Trp. Knight, who had pulled behind Trp. Parrott during the initial traffic stop. Trp. Parrott notified Trp. Knight of NAGI'S inconsistent statements, the LPR system records that contradicted NAGI'S statements regarding his travel, and the discrepancies regarding the vehicle's registration. Trp. Parrott notified Trp. Knight that during his conversation with NAGI, he observed "several black bags in the back compartment here, and the rest of it is spotless, clean, no bags, not anything in the front."

9. After conducting record checks, Trp. Parrott returned to NAGI'S vehicle. Trp. Parrott notified NAGI that the Ford Expedition's license plate came back to a Nissan. NAGI replied, "Nah, that's bullshit, I just want to let you know that you are being recorded." Trp. Parrott notified NAGI that he was being recorded as well. NAGI replied, "You guys [unintelligible] want to make up a reason to fuck with somebody [unintelligible]..." Trp. Parrott asked NAGI if he had a license or any documentation for his Uber business. NAGI responded that he did. NAGI presented Trp. Parrott with his New York driver's license and stated, "That's New York Class E, you cannot drive Uber in New York without this." NAGI then stated, "You guys are giving me a hard time for no reason." Trp. Parrott asked, "Why are we giving you a hard time?" NAGI responded, "Because this is the second time you [unintelligible]…" Trp. Parrott responded, "It is simple, stop speeding." Trp. Parrott notified NAGI that they were trying to investigate the stop and were just doing their job. Trp. Parrott again notified NAGI that the license plate on the Ford Expedition came back to a Nissan. Trp. Parrott stated, "You are making several trips through here ok...I see the same vehicle, I done stopped you twice now coming through here, when you told me you are staying down there in Raleigh for a week." NAGI shortly thereafter notified Trp. Parrott that he was no longer going to speak with him. Trp. Parrot then notified NAGI that he was being detained.

10. Believing that NAGI was involved in criminal activity, Trp. Parrott requested the assistance of Trp. Knight's K-9, Zeus. Before Trp. Knight deployed Zeus, Trp. Parrott asked NAGI to exit his vehicle and accompany him to his patrol vehicle. NAGI initially refused to comply, and he only exited his vehicle when notified by Trp. Parrott that he would be arrested. After exiting the vehicle, Trp. Parrott observed that NAGI'S jeans were unbuttoned and unzipped and that his belt was unbuckled. Trp. Parrott allowed NAGI to button and zip his jeans. Trp. Parrott then conducted a frisk, or pat-down, of NAGI'S pockets. Trp. Parrott felt what he believed

to be cash in NAGI'S front right pocket and asked NAGI how much money he had in his pocket. NAGI stated, "I don't know, like maybe $1,200." NAGI was then placed in Trp. Parrot's vehicle without restraints. NAGI notified Trp. Parrott that, "If you lie to me about the dog giving an alert and you don't find anything illegal in the car, I am going to sue you guys." Trp. Knight then allowed Zeus to conduct an open-air sniff around the perimeter of the Ford Expedition, which resulted in Zeus giving a positive alert for the presence of an illegal narcotic odor at the front passenger door. A probable cause search of the vehicle was then conducted by Trp. Parrott.

11. While searching the vehicle, Trp. Parrott located a large amount of bulk U.S. currency in the vehicle's center console. The currency was rubber banded together and was stored in a black plastic bag. In the rear of the vehicle, Trp. Parrott located at least two (2) large black bed sheets. At one point in conversation with Trp. Knight, NAGI spontaneously stated that when he "took the car the bed sheets were in it, it's not even mine." Trp. Parrott noted that the vehicle's Global Positioning Satellite (GPS) was set for Burlington, North Carolina, not Raleigh, North Carolina, and he also noted that the vehicle contained several takeout food bags and several cups of coffee that were indicative of hard driving.

12. After discovering the currency and completing his search of the vehicle, Trp. Parrot returned to his vehicle and spoke with NAGI. NAGI was asked about the currency, and he responded that he and his family were "gathering money to buy a store." NAGI then explained that he previously owned a store in New York and that he owed a lot of money. NAGI stated, "If I put it [money] in the bank, they might, you know [unintelligible] take it." When asked if he had any documentation or receipts regarding the currency, NAGI responded, "Ah, no, I don't leave money in the bank like that. Like I told you, if I leave it in the bank, they will take it." NAGI was describing the frustrations of owning a business in New York. NAGI even complained about the price of a pack of cigarettes. NAGI stated, "A pack of cigarettes is like $15,

it is crazy." Trp. Parrott asked NAGI how much money he stilled owed in New York. NAGI responded, "Just for the um, um, hold on, hold on, it is a lot, it is a lot. It is employment insurance…" NAGI also stated that he had a couple of tickets in New York for "selling beer to a minor and tobacco."

13. While Trp. Parrott spoke with NAGI, Trp. Knight photographed evidence located within the Ford Expedition. The photographs depicted several credit cards and/or debit cards, a New York driver's license, food receipts, bags of food, and documents.

14. During the stop, the NCSHP contacted HSI-Raleigh regarding the facts and circumstances of the stop. HSI-Raleigh instructed the NCSHP to seize the bulk U.S. currency as it was likely tied to the trafficking of contraband cigarettes. Trp. Parrott notified NAGI that the funds were being seized by HSI.

15. After seizing the currency, Trp. Knight allowed Zeus to conduct a narcotics sniff on the U.S. currency. Trp. Parrot placed the U.S. currency in a black book bag and then placed three (3) additional similar bags in a line. Trp. Knight deployed Zeus on the bags and Zeus alerted on the bag containing the bulk U.S. currency.

CHARACTERISTICS OF CONTRABAND CIGARETTE TRAFFICKING

16. I know from my knowledge, training, and experience that the regulatory restrictions on the distribution of tobacco permits state and local governments to impose excise taxes on wholesalers of cigarettes. These taxes vary greatly by state. For example, North Carolina's excise tax per carton of cigarettes is approximately $4.50. In New York City, the combined state and local excise tax per carton of cigarettes is $58.20. This nearly $54 difference provides an incentive for individuals and criminal organization to traffic contraband cigarettes from North Carolina to New York for sale.

17. I know from my knowledge, training, and experience that the trafficking of contraband cigarettes involves the use of bulk U.S. currency. This is because contraband cigarette traffickers know that the use of traditional banking systems and purchasing methods (credit cards, debit, cards, wire transfers, etc.) are traceable by law enforcement and can lead to the identification and seizure of their accounts. By purchasing large quantities of cigarettes using bulk U.S. currency, traffickers effectively cut off the ability of law enforcement to trace the traffickers' purchases, proceeds, etc.

18. I know from my knowledge, training, and experience that the traffickers of contraband cigarettes usually possess multiple bundles of bulk U.S. currency. These bundles of bulk U.S. currency are typically held together by rubber bands and are concealed or stored within plastic bags. Further, I know that the traffickers of contraband cigarettes typically separate their bundles of bulk U.S. currency into two (2) groups when travelling south to purchase cigarettes. The first group is the bulk U.S. currency that the trafficker will use to purchase their cigarettes. This bulk U.S. currency may be hidden in a vehicle in a number of different ways including natural voids within the vehicle, consoles, traps, engine compartments, luggage, etc. The second bundle of bulk U.S. currency is significantly less than the first and is the fee paid to the trafficker for their services. This bulk U.S. currency is often kept on the trafficker's person or within the vehicle's glove box or center console.

19. Based on my knowledge, training, and experience, I know that traffickers of contraband cigarettes often deploy several methods to avoid detection by law enforcement when they are travelling between North Carolina and New York. These traffickers often make efforts to avoid traditional routes and purposefully avoid most bridges and tollways. This is because most traffickers know that law enforcement utilizes license plate readers (LPRs) at these locations and that law

7

Case 5:21-cv-00514-BO   Document 1-1   Filed 12/14/21   Page 7 of 13

enforcement can use LPRs to track the movement of the traffickers' vehicles between North Carolina and New York.

20. Based on my knowledge, training, and experience, I know that traffickers of contraband cigarettes often avoid using their own vehicles to traffic cigarettes. This is because traffickers travel long distances making frequent trips between New York and North Carolina and know that law enforcement will seize vehicles used to traffic cigarettes. To mitigate wear and tear on personally owned vehicles and avoid having them seized, traffickers often rent large vehicles. This is for two (2) reasons. First, most traffickers know that law enforcement will not seize a vehicle that belongs to a rental company. Second, the use of a large vehicle (such as a SUV or minivan) allows the trafficker to transport a larger number of contraband cigarettes to New York.

21. Based on my knowledge, training, and experience, I know that traffickers of contraband cigarettes know that they cannot transport bulk cigarettes in plain view within their vehicle. For this reason, traffickers often use black sheets or tarps to cover their cigarettes.

22. Based on my knowledge, training, and experience, I know that traffickers of contraband cigarettes often take steps to establish residency in North Carolina. This often involves obtaining a North Carolina driver's license. Traffickers take these steps to reduce the likelihood that they will be identified as traffickers of cigarettes from New York.

## FINDING BY HSI-RALEIGH

23. As part of this investigation, I have conducted motor vehicle registration checks via the National Law Enforcement Telecommunication System (NLETS). My initial registration checks were conducted on or about July 22, 2021. The registration checks revealed that the license plate on the Ford Expedition was registered to a 2021 Nissan Altima owned by PV Holding Corporation (PVHC), also known as Budget Car

Rental, and expired on or about June 30, 2021. On or about December 8, 2021, I reran the registration checks. The registration checks revealed that while the registration had been renewed by PVHC, the license plate was still registered to a 2021 Nissan.

24. As part of this investigation, I have conducted searches of DHS databases. The DHS databases revealed that NAGI had previously been encountered by the Virginia State Police (VSP) on or about May 7, 2019. During the encounter, NAGI was found to be in possession of $24,000 in bulk U.S. currency and other evidence indicative of contraband cigarette smuggling. Specifically, NAGI was in possession of documentation that included prices for cartons of cigarettes. The VSP contacted HSI Norfolk, Virginia (HSI-Norfolk) regarding the funds, however, because NAGI possessed documentation of income that provided a plausible explanation for the funds, the funds were not seized.

25. As part of this investigation, I have conducted searches of the Halifax County, North Carolina Geographic Information System (GIS) and property tax databases. The searches revealed that the address NAGI provided to Trp. Parrott, 1321 Chase Avenue, Roanoke Rapids, North Carolina, does not exist.

26. As part of this investigation, I have conducted searches of the North Carolina Employment Security Commission (NCESC) database. The searches revealed no reported wages for NAGI in North Carolina.

27. As part of this investigation, I requested and obtained New York driver's license records. The records revealed that NAGI was issued a class E driver's license on or about December 20, 2010. At the time, NAGI listed his address as 111-08 Merrick BL A1, Jamaica, New York. The NCSHP located a New York class E driver's license in the 2021 Ford Expedition. The license was issued on or about December 18, 2017, and listed NAGI'S address as 111-08 Merrick BL A1, Jamaica, New York. This is evidence that NAGI lives in New York, not North Carolina.

28. As part of this investigation, Customs and Border Protection (CBP) officials provided a Notice of Seizure to NAGI at his address in Raleigh, North Carolina, as reflected on his North Carolina driver's license. The notice was returned as "Return to Sender – Unable to Forward". In an effort to provide notice to NAGI, CBP routed a second Notice of Seizure to NAGI'S New York address, as listed on his New York driver's license. The notice was delivered and NAGI filed a claim, through counsel, shortly thereafter. Documentation included with his claim listed NAGI'S address as 111-08 Merrick BL A1, Jamaica, New York. This is additional evidence that NAGI lives in New York, not North Carolina.

29. As part of this investigation, HSI-Raleigh served a subpoena requesting records related to the rental of the Ford Expedition by NAGI from PVHC. PVHC provided the following:

   a. The 2021 Ford Expedition was rented by NAGI on or about June 24, 2021, at approximately 1933 hours. The vehicle was picked up from 88-08 23rd Avenue, East Elmhurst, New York and at the time had a beginning mileage reading of 12,631.

   b. The vehicle was returned on or about July 17, 2021, at approximately 1439 hours. The vehicle was returned to 88-08 23rd Avenue, East Elmhurst, NY and at the time had an ending mileage reading of 19,803 (7,172 miles driven over 23 days).

30. As part of this investigation, I have conducted searches of LPR system databases. The databases revealed that the 2021 Ford Expedition bearing Florida license plate DZJ174 was making routine trips back and forth between New York/New Jersey and North Carolina during the period in which it was rented by NAGI. LPR records revealed the following:

a. On or about June 25, 2021, at approximately 1705 hours, Florida license plate DZJ174 was scanned heading southbound on I-295S (New Jersey Turnpike) at or near the Delaware Memorial Bridge.

b. On or about June 25, 2021, at 2245 hours, Florida license plate DZJ174 was scanned on I-85 (unknown direction) at or near Oxford, North Carolina.

c. On or about June 29, 2021, at 0317 hours, Florida license plate DZJ174 was scanned on I-85 (unknown direction) at or near Oxford, North Carolina.

d. On or about June 29, 2021, at 1017 hours, Florida license plate DZJ174 was scanned in a Motel 6 parking lot at or near Burlington, North Carolina.

e. On or about July 5, 2021, at 1500 hours, Florida license plate DZJ174 was scanned at a Sunoco Gas Station at or near Woodbridge, New Jersey.

f. On or about July 7, 2021, at 0656 hours, Florida license plate DZJ174 was scanned on I-85 (unknown direction) at or near Oxford, North Carolina.

g. On or about July 10, 2021, at 0104 hours, Florida license plate DZJ174 was scanned on I-85 (unknown direction) at or near Oxford, North Carolina.

h. On or about July 13, 2021, at 2326 hours, Florida license plate DZJ174 was scanned heading southbound on I-295S (New Jersey Turnpike) at or near the Delaware Memorial Bridge.

i. On or about July 14, 2021, at 0424 hours, Florida license plate DZJ174 was scanned on I-85 (unknown direction) at or near Oxford, North Carolina.

j.  On or about July 14, 2021, at 2206 hours, Florida license plate DZJ174 was scanned heading southbound on I-295S (New Jersey Turnpike) at or near the Delaware Memorial Bridge.

31. As part of this investigation, HSI-Raleigh served a subpoena on T-Mobile for records related to NAGI'S cellphone number, XXX-XXX-2101. A review of the response from T-Mobile revealed the following:

c.  No subscriber name or address was associated with the phone number at it was a prepaid number. Service for the number began on or about August 8, 2017, and the number had been last replenished on or about August 4, 2021.

d.  A review of call data revealed that NAGI placed a phone call on or about July 13, 2021, at approximately 2341 hours UTC (1941 hours ET) to XXX-XXX-9533. Records show the call was placed to the Yemen Café located at or near 176 Atlantic Avenue, Brooklyn, New York. This is consistent with a receipt located in the 2021 Ford Expedition on July 14, 2021. The receipt noted that an order from XXX-XXX-2101 was placed on or about July 13, 2021, at 1942 hours. This is evidence that NAGI was in New York on July 13, 2021, and was not returning home from Roanoke Rapids, North Carolina as he claimed during his encounter with the NCSHP.

32. As part of this investigation, I have reviewed the dash cam video and photographs provided by the NCSHP. Based on my knowledge, training, and experience, the Ford Expedition rented and driven by NAGI is consistent with the type of vehicle used to smuggle contraband cigarettes from North Carolina to New York. Furthermore, the lack of luggage, the black bed sheets, the manner in which the bulk U.S. currency was bundled and concealed, and NAGI'S contradicting statements are all indicative of contraband cigarette smuggling.

## CONCLUSION

33. Based on the foregoing, probable cause exists to believe that the aforementioned $55,700 in U.S. currency it constitutes or is derived from proceeds traceable to specified unlawful activity, as defined in Title 18, U.S.C., Section 1957(c)(7), including the trafficking of contraband cigarettes in violation of Title 18, U.S.C., Section 2342.

34. The foregoing facts are therefore sufficient to support a reasonable belief that the $55,700 in U.S. currency is forfeitable to the United States pursuant to Title 18, U.S.C. § 981(a)(1)(c).

I, Christopher E. Brant, declare under penalty of perjury, that the foregoing information as known or provided to me is true and correct to the best of my knowledge and belief, in accordance with 28 U.S.C. § 1746.

Executed this 13th day of December 2021

_____
Christopher E. Brant
Special Agent
Homeland Security Investigations